**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**RICHARD HORNSBY,**
**P.O. Box 1631**
**Los Altos, CA 94023 ,**

**Plaintiff,**

**v.**

**MELVIN L. WATT,**
**Director**
**Federal Housing Finance Agency**
**400 Seventh Street, S.W.**
**Washington, DC 20219,**

**Defendant.**

**Civil Action No. _______________**

**COMPLAINT**
(Employment Discrimination)

**Introduction**

1. Plaintiff Richard Hornsby brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e)-2 *et seq.*, and 42 U.S.C. § 1981a, to redress unlawful employment discrimination in the form of retaliation for his prior protected EEO activity, perpetrated against him by the Federal Housing Finance Agency ("FHFA"). Specifically, plaintiff contends that his FHFA supervisor, Melvin L. Watt, Director of the FHFA, retaliated against him due ultimately to his having resolved an EEO retaliation claim against the agency and its then human resources director, by (a) failing to return him to duty status as the agency's Chief Operating Officer, having placed him on a forced excused absence upon his being escorted from the FHFA work site based on allegations made by the human resources director that he had threatened the life of the

former director of the agency, when on November 19, 2015, he was exonerated of all charges that he had made any such threats by the Superior Court of the District of Columbia after a full trial, and (2) by proposing plaintiff be removed from his position and from the federal service on December 19, 2015

**Jurisdiction**

2. This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16(c) and by the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Subject matter jurisdiction is also pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, thereby presenting a federal question.

**Venue**

3. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b) as the events giving rise to plaintiff's claims occurred in this judicial district, the personnel records of defendant concerning plaintiff are here, and the defendant is located, has offices, and conducts business in this judicial district.

**Exhaustion of Administrative Remedies**

4. All of the necessary administrative prerequisites for filing the above-referenced claims have been met, as plaintiff timely filed a formal administrative complaint of discrimination (retaliation) on March 19, 2015, having first timely engaged the administrative EEO process with an informal complaint on December 15, 2015, and the Federal Housing Finance Agency Affairs issued a Final

Agency Decision (FAD) with regard to plaintiff's formal EEO complaint on December 22, 2015 – that is, within 90 days of the filing of the instant complaint with this Court.

## Parties

5. Plaintiff Richard ("Rick") Hornsby is a citizen of the United States and a resident of the State of California. Until he was involuntarily terminated by the FHFA on March 21, 2015, Mr. Hornsby was the agency's Chief Operating Officer, since December 6, 2011, though he was on forced excused absence (and barred from FHFA's facilities) from April 28, 2014.

6. Defendant Melvin L. Watt is, and has been since January 6, 2014, the Director of the Federal Housing Finance Agency ("FHFA"), and as such is the head of the FHFA, which is an independent agency within the Executive branch of the government of the United States which has employed at least 600 persons in each of the last 20 months. Mr. Watt is here named as defendant in his official capacity as head of the FHFA only.

## Statement of Facts

7. Rick Hornsby is a financial executive of long experience. He hailed originally from the State of Utah and graduated from Utah State University in 1981 with a Bachelor of Science degree in Business Administration (Finance) and received a Masters in Business Administration ("MBA") from the same university in 1989. After working as a commercial loan officer with First Security Bank for three years following graduation from college, in October of 1984, Mr. Hornsby joined the staff of the Federal Reserve Bank of San Francisco. He served the Federal Reserve Bank for more

than 25 years in positions of ever increasing authority and importance, retiring in December 2010 as a group Vice President for Corporate Financial Planning and Control.

8. In 2011, Mr. Hornsby was recruited out of retirement by the Federal Housing Finance Agency, a non-appropriated fund instrumentality of the government of the United States, which had engaged in a national search to fill the position of Chief Operating Officer, a job being vacated by Edward DeMarco, as he became the acting Director of the FHFA. Mr. Hornsby was interviewed by Mr. DeMarco and others at the top tier of the FHFA for the Chief Operating Officer ("COO") job, a position that had many of the same duties and responsibilities as he had performed for the Federal Reserve Bank of San Francisco. He was selected for the COO position at FHFA and entered on duty on December 5, 2011. The position paid some $260,000 per year in salary.

9. For the most part, Mr. Hornsby got on well as the COO of the FHFA, both with his executive peers at the agency and his subordinates in the units of the FHFA that reported to him. He also got along well with his supervisor, Ed DeMarco, the acting Director of the Agency and his predecessor as the agency's COO. In fact, for 2012, Mr. Hornsby's first full year as COO at the FHFA, DeMarco rated him "Outstanding" and gave him a bonus of over $17,500.00. In addition, DeMarco authorized a retention allowance for Mr. Hornsby of over $25,000 per year to help defray the costs of his maintaining a residence in Washington (in addition to his home in California) and frequently traveling back to California to see his wife. All of the remuneration from Mr. Hornsby's position as COO of FHFA – salary, bonus, retention allowance – were in addition to the retirement pay he was getting from his 25-plus year career with the Federal Reserve Bank of San Francisco.

10. During the first half of 2013, Mr. Hornsby continued to enjoy positive feedback from his supervisor at FHFA, Edward DeMarco, with regard to his job performance as COO. During this period, however, the Obama administration nominated a congressman, Melvin L. Watt, to be the new Director of the FHFA, and Mr. DeMarco seemed to become increasingly concerned that Mr. Watt would in fact be confirmed by the Senate and that he (DeMarco) would be forced to return to a subordinate position as one of the deputy directors of the agency in charge of one of its areas of operation, but without the overall, agency-wide authority and reach he enjoyed as the acting Director, and had enjoyed as COO. This became a likely scenario – Mr. Watt being confirmed – by September 2013, and Mr. DeMarco then began a campaign of criticism and abuse of Mr. Hornsby which, in hindsight, led plaintiff to conclude that DeMarco wanted to encourage him to vacate his position as COO of the FHFA.

11. In this regard, in September 2013 DeMarco abruptly cancelled Mr. Hornsby's retention allowance effective at the end of that year. In December 2013, DeMarco indicated that he had become severely disappointed with Mr. Hornsby's job performance as COO, and would be giving him a critical rating for the year – one that would not permit him to receive a bonus – despite the fact that in his summer 2013 mid-year review of Mr. Hornsby's job performance, DeMarco had indicated that plaintiff was on target and performing well under challenging circumstances. It was untrue that plaintiff had performance problems in 2013 and he provided DeMarco with his own review of his accomplishments for the year after its conclusion. Nevertheless, DeMarco provided Mr. Hornsby with a "Fully Successful" rating for 2013 on March 11, 2014 – a rating that would not ordinarily permit Mr. Hornsby's being paid a cash bonus for 2013.

12. Melvin Watt was confirmed by the Senate in late December 2013 as the Director of the FHFA and took office on January 6, 2014. Accordingly, Edward DeMarco reverted to a deputy director position with the agency (but not his former position as COO). Unable to bully Mr. Hornsby into departing the FHFA and thereby vacating the COO position so that DeMarco might once again serve in that capacity, in late March 2014, DeMarco announced that he would leave the FHFA and retire from federal service at the end of April 2014.

13. While Mr. Hornsby was unhappy with DeMarco's rating of him for 2013, by mid-March 2014 he had made his peace with it and was planning to improve his position an the agency in 2014 by working hard to please his new boss, Melvin Watt. Indeed, his only effort regarding the effects of Mr. DeMarco's parting "Fully Successful" rating of him for 2013 was to try to insure that he did not receive some lesser bonus for him, but only the zero bonus he expected with such a rating, so as to minimize the embarrassment he was suffering seeing his rating go from "Outstanding" to "Fully Successful" – a two level drop – in a single year. The relatively small loss that no cash bonus for 2013 presented to him was, to his mind, of negligible importance. He simply wanted to get on with his job as COO of the FHFA under his new supervisor, with DeMarco gone from the agency and his work life.

14. With regard to his effectively doing his job as COO, by mid April 2014 he was losing confidence in one of his prime subordinates at FHFA, the head of its human resources unit ("HR"), Jeffrey Risinger. The performance of HR at FHFA had become worrisome during 2013, and it was being recognized as such even by Edward DeMarco, who had brain-stormed with Mr. Hornsby during his last year as acting director of the agency on how to better the unit's performance in

service to the FHFA's mission. Though Mr. Hornsby had supported Risinger, had given him an outstanding rating for 2013 and had initially believed his representations concerning a reorganization that minimized the role of Risinger's deputy in HR, Marie Harte – Risinger had told Mr. Hornsby that she fully supported the reorganization and that her new role after reorganization was her "dream job" – in the last part of April, he had began to see that Risinger was resisting placing into effect a needed "triage plan" for the HR unit. For his part, Risinger, who was looking to leave FHFA for a top human resources position with a university medical school in his home town, began to fear he would not receive a positive reference from Mr. Hornsby when he would need it for this new position.

15. More importantly, though, Mr. Hornsby had supported Risinger with an affidavit in an EEO complaint brought by Ms. Harte to the effect that the earlier reorganization of HR was designed by Risinger as an act of retaliation against her because she had, against Risinger's wishes, brought a sexual harassment claim of one of her female subordinates (against a male term employee in HR whom Risinger thought well of) to agency EEO officials, and he came to realize that Risinger had deceived him about Ms. Harte. This came about in a rush when, on the afternoon of Friday, April 25, 2014, Mr. Hornsby attended a mediation of Ms. Harte's EEO retaliation claim, and for the first time, heard her describe her situation in HR and her position on the effect of Risinger's 2013 reorganization, the EEO activity on her part that brought this retaliation on, and Risinger's dogged resistance to effecting the triage plan (which would have her return to a prominent role in HR). Mr. Hornsby attended that mediation as the FHFA's settlement officer for EEO and other personnel claims, and he agreed to settle Ms. Harte's EEO claims on behalf of the FHFA.

16. Risinger, who was becoming increasingly worried about Mr. Hornsby's view of him and his performance as head of HR throughout April of 2014, began to invent a story that Mr. Hornsby had threatened to do bodily harm to Edward DeMarco, who was to depart the agency's employ at the end of that month, because of his purported "rage" over the "Fully Successful" rating for 2013 and its effect of eliminating the possibility of cash bonus in 2015. This was pure invention on Risinger's part as Mr. Hornsby never uttered any such threats. When, on the afternoon/evening of April 25, 2014, Risinger heard that Mr. Hornsby had agreed to settle Ms. Harte's EEO retaliation claims in which Risinger was the alleged retaliator (which settlement included both Ms. Harte receiving a review of her performance and the initiation of the triage plan), he thereafter – on the following Monday, April 28, 2014, "reported" the threats against DeMarco life and physical well being that he claimed Mr. Hornsby he had made to him to the FHFA's lawyers and then to agents of its Office of Inspector General.

17. This completely false claim that Mr. Hornsby had uttered threats to kill or do physical injury to Edward DeMarco by Risinger resulted in Mr. Hornsby being escorted from the agency facilities and placed on excused absence status, without him even being told of the actual allegations or who had made them. This was on Monday, April 28, 2014, and it was all done with the approval of Melvin Watt, the Director of the FHFA. The next day, April 29, 2014, agents of the FHFA's Office of Inspector General ("OIG") called on Mr. Hornsby at his residence and, after advising him his rights (*e.g.*, to remain silent, etc.), he waived those rights and answered the OIG agents' questions, making a full statement in which he unequivocally and absolutely denied making any threats against the life or physical well being of Edward DeMarco.

18. On April 30, 2014, at approximately 10:30 p.m., armed agents of FHFA's Inspector General's office, in assault gear, came to Mr. Hornsby's residence and placed him under arrest on charges of three felonies, all based on the uncorroborated claims of Jeffrey Risinger, having to do with attempting to kidnaping, murder, and do bodily harm to Edward DeMarco – claims that Mr. Hornsby had plainly and clearly denied the previous day to OIG agents after waiving his right to remain silent. Mr. Hornsby was removed from his residence by the armed "OIG" agents and taken to the D.C. lock-up, where, due to the lateness of the hour, he remained overnight. It was not until mid afternoon on the day following his arrest by FHFA' OIG agents that Mr. Hornsby he was released after pleading not guilty to the three felony charges at a judicial hearing, but he was required to report weekly to the pretrial services during his release. Also, some "senior official of the FHFA" leaked the news of Mr. Hornsby's arrest to the Washington Post, the Wall Street Journal, and Bloomberg Business News, thereby further harming Mr. Hornsby.

19. Retaining counsel to represent him in the criminal proceedings before the Superior Court for the District of Columbia – Marlon C. Griffith, Esq. – Mr. Hornsby remained on paid excused absence from his position a FHFA. As proceedings before a grand jury were said to have been arranged, and a date for such grand jury proceeding approached, Melvin Watt contacted Mr. Hornsby to offer him a monetary "buy-out" from FHFA (for about half his annual salary), and urge him to take that buy-out by noting that the agency would not be able to offer him such an arrangement once he was indicted. During this same period, FHFA's General Counsel, Alfred Pollard, spoke with Mr. Griffith, Mr. Hornsby's criminal counsel, to urge him to get Mr. Hornsby to take the offered buy-out and that doing so would make the criminal charges disappear. At his counsel's urging, Mr. Hornsby contacted Mr. Watt to inquire whether Mr. Pollard had been

authorized to make that unethical offer to Mr. Griffith, and Mr. Watt not only affirmed that Pollard had been authorized to do so, but also warned Mr. Hornsby that whatever the outcome of the criminal proceedings, he would not be returning to the FHFA (*i.e.*, that ultimately Mr. Watt would involuntarily terminate Mr. Hornsby's employment at the agency – even if he was acquitted of the criminal charges), so he should take the offered buy-out while the agency could still offer it. Naturally, being completely innocent of the criminal charges, Mr. Hornsby declined to take the offered buy-out, opting instead to defend himself in any criminal proceedings.

20. No gand jury was ever convened. Instead, the U.S. Attorney's office reduced the charge against Mr. Hornsby to two misdemeanors so as to negate Mr. Hornsby's right to trial by jury. As trial approached on these misdemeanor charges, without any warning, FHFA Director Melvin Watt proposed that Mr. Hornsby be placed on "indefinite suspension" until the criminal charges had been resolved, which would stripped Mr. Hornsby of his salary with the trial still about a month away. Due to a procedural defect pointed out by Mr. Hornsby's employment counsel – Watt was the proposing official, but he had appointed a subordinate as the deciding official, thereby bringing into question the unbiased nature of the decisional process – this proposed adverse action was never acted upon, but was left dangling over Mr. Hornsby's head thereafter.

21. On November 18 and 19, 2014, a bench trial was held on the misdemeanor charges against Mr. Hornsby before te Hon. Juliet J. McKenna, Associate Judge, Superior Court of the District of Columbia. On November 20, 2014, Judge McKenna found Mr. Hornsby not guilty of all charges and dismissed the case. In rendering her decision from the bench, Judge McKenna of course stated that the government had failed to meet its burden "beyond a reasonable doubt" – the burden of proof

in criminal cases – but she went on to provide an explanation of how she came to reach the conclusion that the government had failed to meet its burden of proof. In doing so, Judge McKenna described on the record, at length and in detail how and why she had come to the conclusion that Jeffrey Risinger, the only witness to the threats allegedly made against Edward DeMarco by Richard Hornsby, was not in the least credible in his assertion that threats had been uttered by Mr. Hornsby, and that he had a motive to fabricate the entire account.

22. Free at last of the criminal charges, and fully exonerated by Judge McKenna's ruling, Mr. Hornsby expected to be returned to duty in his COO position at the FHFA, particularly since the COO position at the agency had not been filed on a permanent basis, and, like Edward DeMarco, Jeffrey Risinger and the acting Inspector General at the end of April 2014, the official who had ordered Mr. Hornsby's arrest, had departed the FHFA's employ. He was certainly chagrined – if not particularly surprised, given the threat to fire him no matter the outcome of the criminal proceedings made months previous by Melvin Watt – when Mr. Watt refused to return him to duty at FHFA in any capacity.

23. Indeed, on December 19, 2014, Mr. Watt issued a proposal to terminate Mr. Hornsby from his position with FHFA and from the federal service for misconduct – *i.e.*, "conduct unbecoming" a federal management official. The lead allegations of misconduct are the claims that Mr. Hornsby threatened violence and death on the then former Director of FHFA, Edward DeMarco – claims which were made only by Jeffrey Risinger, whose testimony had been specifically found to be incredible with regard to those claims by a judge before whom he had testified about them. The balance of the claimed misconduct on the part of Mr. Hornsby that Watt cites in support of the

proposed removal are composed of individual statements Mr. Hornsby allegedly made over his last two years of his being COO at the FHFA, almost all of which were untrue and twisted out of context, or in one case where the allegation was true (using a profanity), he had apologized immediately after he uttered the common profane word. Moreover, as is clear from the allegations themselves, they were pieced together after the fact – sometimes long after the events on which they were based – with a view toward building a case to terminate Mr. Hornsby. Further, it was operatives of the FHFA's Office of General Counsel and OIG who collected / invented all the allegations beyond those related to Risinger's claims that Mr. Hornsby had threatened Mr. DeMarco's life and health during April of 2014.

24. On March 19, 2015, FHFA Director Melvin Watt issued a decision on his proposal to remove Mr. Hornsby from his position as COO of the agency, and from the federal service effective on March 21, 2015. Mr. Hornsby timely appealed this adverse action to the U.S. Merit Systems Protection Board ("MSPB") as a "mixed case" (that is, both as a violation of civil service law, rules or regulations *and* as an act of unlawful retaliation under Title VII of the Civil Rights Act of 1964, as amended). As of the filing of this complaint, Mr. Hornsby's MSPB mixed case appeal of the removal is still pending. Thus, the actual removal decision is not an allegation in this complaint, but will be added once the MSPB decision is had and Mr. Hornsby has thereby exhausted his available administrative remedies.

25. In any event, the FHFA Director's refusal to reinstate Mr. Hornsby to duty status once he was found not guilty of all criminal charges and was otherwise exonerated by Superior Court Judge who heard the evidence at the trial, and Mr. Watt's later proposal to remove Mr. Hornsby from his

COO position with FHFA and from the federal service, had their genesis in Risinger's and the agency's retaliation against Mr. Hornsby for his having agreed to settle Marie Harte's EEO retaliation complaint against Risinger, reversing the retaliatory actions he had taken against her. Indeed, the FHFA's actions with respect to Mr. Hornsby since Risinger made known his retaliatory false claim about Mr. Hornsby having threatened Edward DeMarco have been a continuing campaign of retaliation for Mr. Hornsby's prior EEO activity.

**Statement of Claims**

26. FHFA management's treatment of plaintiff in refusing to reinstate him to duty after he was found not guilty of the charges which had cause the agency to place him on an excused absence status, and he was otherwise exonerated by the trial court, on November 20, 2015, constitutes an act of unlawful retaliation against plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e)-2 *et seq.*, and 42 U.S.C. § 1981a.

27. As a direct and proximate result of this unlawful retaliatory act of refusing to return him to duty following the Superior Court proceeding in the criminal prosecution on November 20, 2015, plaintiff has suffered and continues to suffer economic losses, lost pay and benefits, lost career benefits and lost career opportunities, injuries in the form of personal and professional humiliation and embarrassment, as well as other emotional distress and pain and suffering.

28. FHFA management's treatment of plaintiff in proposing his removal from his position with the agency and from the federal service on December 19, 2015, also constitutes an act of unlawful

retaliation against plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e)-2 *et seq.*, and 42 U.S.C. § 1981a.

29. As a direct and proximate result of this unlawful retaliatory act of proposing his removal from his position with the FHFA and from the federal service on December 19, 2015, plaintiff has suffered and continues to suffer economic losses, lost pay and benefits, lost career benefits and lost career opportunities, injuries in the form of personal and professional humiliation and embarrassment, as well as other emotional distress and pain and suffering.

**Prayer for Relief**

WHEREFORE, plaintiff prays that this Court enter judgment in his favor and against defendant on the claims of unlawful retaliation in employment practices brought herein pursuant to Title VII of the Civil Rights Act of 1964, as amended, and provide him with the following relief:

(a) award plaintiff compensatory damages against defendant in the amount of $300,000.00, plus interest thereon;

(b) order defendant to provide plaintiff with outstanding performance ratings for 2014, 2015 and every period thereafter, with bonus and pay increases earned thereby to be paid with interest;

(c) order defendant to credit all annual leave and sick leave that plaintiff would have earned had he been restored to duty effective November 21, 2015, and had remained on the roles since then;

(d) enjoin defendant and its officers and directors from retaliating against plaintiff further;

(e) award plaintiff the costs of bringing and maintaining this civil action and the administrative complaints that necessarily preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. 2000e-5(k); and

(f) award plaintiff such other and further relief as the interests of justice may require.

**Jury Demand**

Plaintiff hereby requests a trial by jury on all issues of fact, including the measure of damages.

Respectfully submitted,

David H. Shapiro
D.C. Bar No. 961326
SWICK & SHAPIRO, P.C.
1101 15th Street, N.W.
Suite 205
Washington, DC 20005
Tel (202) 842-0300
Fax (202) 842-1418
Email - dhshapiro@swickandshapiro.com

Attorney for Plaintiff